**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNIVERSITY OF KANSAS HOSPITAL AUTHORITY,** *et al.,* | |
| **Plaintiffs,** | |
| | Civil Action No. 11-cv-1382 (BJR) |
| **v.** | **ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT** |
| **KATHLEEN SEBELIUS, Secretary, U.S. Department of Health and Human Services,** | |
| **Defendant.** | |

## I.    INTRODUCTION

Plaintiffs University of Kansas Hospital Authority ("KU"), Via Christi Regional Medical Center ("Via Christi"), and Stormont-Vail Regional Medical Center ("Stormont-Vail") (collectively "Plaintiffs") challenge the Defendant Secretary of Health and Human Services (the "Secretary")'s final decision regarding Plaintiffs' Medicare "Disproportionate Share Hospital" adjustments for the fiscal year 1996. Plaintiffs bring this action pursuant to Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* (the "Medicare Statute").

Presently before the Court are Plaintiffs' Motion for Summary Judgment (Dkt. 21 "Pls.' Mot.") and the Secretary's Cross Motion for Summary Judgment (Dkt. No. 23 "Def.'s Mot."). Upon consideration of the motions, the memoranda in support thereof, the entire record, and the applicable law, the Court will DENY Plaintiffs' Motion for Summary Judgment and GRANT the Secretary's Cross Motion for Summary Judgment. The Court's reasoning is set forth below.

## II. STATUTORY AND REGULATORY BACKGROUND

### A. The Medicare Program

Title XVIII of the Social Security Act established the federally funded health insurance program for the elderly and disabled, commonly known as "Medicare." 42 U.S.C. § 1395 *et seq.* (1976). Medicare authorizes federal payment for covered health care services provided by hospitals, skilled nursing facilities, outpatient rehabilitation facilities, and the like. §§ 1395x(u), 1395cc. This case arises under Part A of Medicare, which generally provides health insurance for inpatient hospital medical services. §§ 1395c, 1395d. Under Part A, a participating hospital enters into an agreement with the Secretary whereby the hospital promises to render services to Medicare beneficiaries. § 1395cc. The hospital does not charge the Medicare beneficiaries for the services (except for certain deductible and coinsurance amounts), but instead, the federal government directly reimburses the hospital for the services rendered. § 1395cc(a)(1). However, the hospital is not reimbursed for the actual cost that it incurred in treating Medicare beneficiaries; rather, the hospital receives payments based on the Medicare beneficiary's diagnosis at discharge, regardless of the hospital's actual cost associated with treating the beneficiary. § 1395ww(d). The payment for each diagnosis is set according to predetermined standardized rates. § 1395ww(d)(1)-(4).

In addition, in general, a hospital is not reimbursed at the time of service, but rather, the hospital must file an annual report showing the costs it incurred during the fiscal year and the portion of those costs allocated to Medicare. 42 C.F.R. §§ 413.24, 413.50. The report is filed with a fiscal intermediary ("FI"), which is typically a private insurance company acting under contract with the Secretary. 42 U.S.C. § 1395ww(d)(5), 42 C.F.R. § 413.20(b). After auditing the

hospital's report, the FI determines the amount of reimbursement owed to the hospital by

Medicare through the issuance of a Notice of Program Reimbursement ("NPR"). 42 C.F.R. §

405.1803(a). If the hospital is dissatisfied with the FI's award, it has 180 days to appeal to the

Provider Reimbursement Review Board (the "PRRB"), which issues a decision that the Secretary

may reverse, affirm, or modify within sixty days. 42 U.S.C. § 1395oo(f)(1). If the hospital

remains dissatisfied after either the PRRB or the Secretary issues a final decision, it may seek

judicial review by filing suit in the appropriate federal district court. *Id*.

> **B.      The Medicare Disproportionate Share Hospital Adjustment**

As discussed above, at the end of each fiscal year, the federal government reimburses

participating hospitals for the portion of their annual operating costs allocated to Medicare. It

does this under a system of prospectively determined standardized rates (*i.e.*, the hospitals are

reimbursed at pre-set rates based on a patient's diagnosis at discharge); however, these

predetermined rates may be adjusted for specific hospitals under certain circumstances

recognized by Congress. 42 U.S.C. § 1395ww(d). This case involves one such adjustment,

known as the Medicare Disproportionate Share Hospital ("DSH") adjustment. *Id*. at §

1395ww(d)(5)(F). Under the Medicare DSH adjustment, the federal government pays more to

hospitals that "serve[] a significantly disproportionate number of low-income patients." *Catholic

Health Initiative Iowa Corp. v. Sebelius*, __ F.3d __, 2013 WL 2476896, *1 (D.C. Cir. June 11,

2013) (quoting § 1395ww(d)(5)(F)(i)(I)). This provision is based on Congress's judgment that

low-income Medicare patients have generally poorer health and are costlier to treat than high-

income Medicare patients. *Id*. (citing *Adena Reg'l Med. Ctr. v. Leavitt*, 527 F.3d 176, 177-78

(D.C. Cir. 2008)). To compensate for this disparity, Congress authorized the Secretary to

disburse extra Medicare funds—the Medicare DSH adjustment—to hospitals that treat a

disproportionate share of low-income patients. *Cabell Hunting Hosp., Inc. v. Shalala*, 101 F.3d 984, 986 (4th Cir. 1996).

Whether a hospital qualifies for the Medicare DSH adjustment is based on the hospital's "disproportionate low-income patient percentage"—the higher the hospital's disproportionate low-income patient percentage, the greater Medicare DSH adjustment the hospital will receive. 42 U.S.C § 1395ww(d)(5)(F)(v); *Catholic Health*, 2013 WL 2476896 at *1. The disproportionate low-income patient percentage, in turn, is based, in part, on how many *Medicaid* beneficiaries a hospital treats.[1] Specifically, the "disproportionate low-income patient percentage" is determined by dividing the total number of inpatient hospital days for which the treated patient is a Medicaid beneficiary, but who is not entitled to benefits under Medicare Part A, by the total number of inpatient hospital days for that same time period.[2] This is commonly referred to as the Medicaid Fraction. *Banner Health v. Sebelius*, 715 F. Supp. 2d 142, 146 (D.D.C. 2010) (citing *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 272 (6th Cir. 1994)). The Medicare statute defines the Medicaid Fraction as:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State [Medicaid plan], but who were not entitled to benefits under part A of [Medicare], and the denominator of which is the total number of the hospital's patient days for such period.

---

[1]     Medicaid is a separate program from Medicare. It is a jointly funded, federal-state program that provides health care to indigent persons who are aged, blind, or disabled, or members of families with dependent children. 42 U.S.C. §§ 1396 *et seq*. While these are separate programs, the amount of reimbursement a healthcare service provider receives under one program is often affected by the services it provides pursuant to the other program.

[2]     For example: A hospital treats ten patients during a given fiscal year. Patients A through H receive inpatient services for nine days each, and Patients H and I receive inpatient services for ten days each. The total number of patient days for that hospital is ninety-two ((8 patients  x 9 days) + (2 patients  x 10 days) = 92 patient days). If Patients A through H are not Medicaid beneficiaries, and Patient I is a Medicaid beneficiary (but is not eligible for Medicare benefits under Part A), the hospital's total number of Medicaid-eligible days for purposes of determining the hospital's "disproportionate low-income patient percentage" is ten (Patient I's ten days of inpatient treatment).

*Id.* § 1395ww(d)(5)(F)(vi)(II). As the D.C. Circuit stated recently (in a masterful

understatement): "[t]his language is downright byzantine and its meaning not easily discernible."

*Catholic Health*, 2013 WL 2476896, at *2. However, in general, under this formula, a hospital's

Medicare DSH adjustment increases as the number of *Medicaid*-eligible patient days in the

numerator of hospital's Medicaid Fraction increases. *Adena*, 527 F.3d at 178; *Cabell*, 101 F.3d at

985 (noting that the Medicare statute provides a hospital more money for Medicare patients the

more Medicaid patients it treats).[3]

### C.     HCFA Ruling 97-2

Prior to 1997, the Secretary required that a FI calculate a hospital's Medicaid Fraction by

considering only those Medicaid-eligible patient days for which the hospital was actually

reimbursed through Medicaid. *Cabell*, 101 F.3d at 989. In other words, under the Secretary's

interpretation, it was not sufficient for a patient to simply be Medicaid-eligible in order for the

patient's treatment days to count in a hospital's Medicaid Fraction; rather, Medicaid must have

also paid the hospital for those days.[4] This interpretation had the net-effect of reducing the

number of Medicaid-eligible patient days in a hospital's Medicaid Fraction, which, in turn,

reduced the Medicare DSH adjustment to which the hospital was entitled.

The Fourth, Sixth, Eighth, and Ninth Circuit each rejected the Secretary's interpretation,

holding that it did not comply with Congressional intent to supplement payment to hospitals

---

[3]       This only tells part of the story. A hospital's "disproportionate low-income patient percentage" is actually
the sum of two fractions: the Medicaid Fraction and the Medicare Fraction. *Banner Health*, 715 F. Supp. 2d 146.
However, as the Medicare Fraction is not relevant to the present dispute, it is not necessary for this Court to attempt
to parse out the nuances of that particular fraction.

[4]       It is possible for a patient to be Medicaid-eligible, but for a treating hospital to not be paid by Medicaid for
services to that patient because states are given discretion to determine the type and range of services covered under
their Medicaid programs. 42 C.F.R. § 430.0; *Cabell*, 101 F.3d at 986. For instance, some state Medicaid plans limit
the number of days that Medicaid beneficiaries are covered for inpatient hospital care under Medicaid. *Cabell*, 101
F.3d at 987.  Under these plans, Medicaid will not reimburse a hospital for days that exceed the number of allowed
inpatient days. *Id*. In other words, the patient is Medicaid-eligible under such a plan, but Medicaid will not cover the
excess inpatient days.

serving low-income Medicare individuals. *Legacy Emanuel Hosp. & Health Center v. Shalala*, 97 F.3d 1261 (9th Cir. 1996); *Deaconess Health Servs. Corp. v. Shalala*, 83 F.3d 1041 (8th Cir. 1996) (per curiam); *Jewish Hosp.,*19 F.3d at 276; *Cabell,*101 F.3d at 984. These Circuits held that the Medicare statute recognizes Medicaid-eligible patient days, regardless of whether the hospital was reimbursed for those days pursuant Medicaid.

In light of these rulings, the Secretary issued HCFA Ruling 97-2 (Feb. 27, 1997) ("HCFA Ruling 97-2"), which prospectively acquiesced to the four Circuit decisions "in order to facilitate uniform program administration." Def.'s Mot. at 6. Thus, HCFA Ruling 97-2 clarified that each Medicaid-eligible patient day should be included in the Medicaid Fraction, regardless of whether or not the hospital received Medicaid reimbursement for that patient day. Administrative Record ("AR") 1137-44.

However, that was not the end of the matter. Confusion on how to implement HCFA Ruling 97-2 arose due to the fact that some states operate two types of health insurance plans for low-income individuals: (1) a Medicaid approved state plan (which is jointly funded by the state and the federal government) and (2) a plan that provides health insurance to low-income individuals who are *not* eligible for Medicaid (which is funded entirely by the state). The parties refer to these as "Federal-State" or "State-only" plans, respectively. Many states operated these plans as "one integrated plan" without distinguishing between the beneficiaries of the plans, and, as such, generally grouped patient days associated with these beneficiaries together into one general category of "Medicaid-eligible days" when they released their annual State Medicaid Reports. Dkt. No. 22, Ex. A at 2-3. This is significant because hospitals rely on these annual Reports to create their annual cost reports for their FIs, and the FIs, in turn, rely on the annual reports to determine the hospitals' Medicaid Fractions.

Therefore, on June 12, 1997, the Secretary issued HCFA Ruling 97-2 Instructions

("Instructions") to address "several inquiries concerning [the] implementation" of HCFA Ruling

97-2 in light of the fact that some states operate their Federal-State and State-only plans in "one

integrated plan." Dkt. No. 22, Ex. A. The Secretary again affirmed that only Medicaid-eligible

patient days (*i.e.*, Federal-State plan beneficiary patient days) could be included in a hospital's

Medicaid Fraction. Because State-only plan beneficiaries are, by definition, not eligible for

Medicaid, days associated with their treatment could not be included in the Medicaid Fraction.

Thus, the Secretary instructed states to "distinguish between State-only and Federal-State

beneficiaries" patient days in their annual State Medicaid Reports. *Id*. at 3.

Nevertheless, the Secretary alleges that FIs in some states were still inadvertently

including State-only beneficiary patient days in Medicaid Fractions because those states had

failed to distinguish between State-only and Federal-State beneficiaries in their State Medicaid

Reports. AR 1148. The Secretary claims that once the Department discovered that this was

occurring, it issued Program Memorandum No. A-99-62 (Dec. 1999) (the "Program

Memorandum") to address the problem. Dkt. No. 21, Ex. 1. The Program Memorandum again

clarified that only Medicaid-eligible patient days can be included in a Medicaid Fraction. "[T]he

focus is on the patient's eligibility for *medical assistance under an approved [Federal-]State

plan*, not medical assistance under a State-only program … if a patient is *not* eligible for medical

assistance benefits under an approved [Federal-]State plan, the patient day cannot [be included

as] a 'Medicaid[-eligible patient] day'…." *Id*. at 1-2 (emphasis in original).

The Secretary specifically recognized that the erroneous inclusion of the State-only

beneficiary patient days in some hospitals' Medicaid Fractions was not the fault of the hospitals,

but rather, the fault of the state agencies who failed to distinguish between State-only and

Federal-State beneficiaries. *Id.* at 3. The Secretary also recognized that some hospitals may have relied on the inclusion of the State-only beneficiary patient days in their Medicaid Fractions in their fiscal planning. As such, the Secretary included a two pronged "hold harmless" provision in the Program Memorandum. Only the second prong, the "Past Payment" prong is relevant to this dispute. *Id.* at 3-4.

Under the Past Payment prong, the Secretary agreed to hold harmless those hospitals that had already received Medicare DSH adjustments that were based on the erroneous inclusion of State-only beneficiary patient days in their Medicaid Fractions. *Id.* To wit, FIs were instructed "not to reopen any cost reports for … periods beginning before January 1, 2000 to disallow the portions of Medicare DSH payments attributable to the erroneous inclusion of … State-only …days if the hospital received payment for those days." *Id.* at 3. In addition, if hospital cost years prior to January 1, 2000 remained open, the FIs were instructed "to allow these types of [erroneously-included] days" but "only in accordance with the practice followed for the hospital at issue before October 15, 1999." *Id.* In other words, if days associated with State-only beneficiaries had been included in a hospital's Medicaid Fraction in the past, the FI was to continue to include such days in the hospital's Medicaid Fraction for cost years prior to January 1, 2000.

## III.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    The MediKan Program

Plaintiffs are three hospitals located in the State of Kansas. MediKan is a health program operated by the Kansas Department of Social and Rehabilitation Services that provides health insurance to disabled individuals who do *not* qualify for Medicaid and is funded by the State (in other words, it is a State-only plan). AR 3, 959, 1121-24. Plaintiffs seek to have certain State-

only beneficiary patient days, referred to by the parties as "MediKan days," included in their Medicaid Fractions for fiscal year 1996 pursuant to the hold harmless provision of the Program Memorandum. The parties distinguish between "primary" and "secondary" MediKan days. Primary MediKan days are days for which MediKan reimbursed the hospital for the services provided. AR 3, 959. Secondary MediKan days are days for which MediKan did not reimburse the hospital for the services furnished (*e.g.*, another insurer had the primary responsibility to pay for the services and MediKan was a secondary payor). AR 3, 959-60.

**B.    Plaintiffs Challenge to the Final Agency Decision**

Plaintiffs Via Christi and Stormont-Vail each submitted cost reports to the FI for fiscal year 1996.[5] The two hospitals reported data provided by the State of Kansas in its Medicaid Provider Summary Report (the "Kansas Report"). Pls.' Mot. at 15. In the Kansas Report, the State of Kansas provided Medicaid data specific to each participating hospital, including what it believed were the number of patient days within the given time period that could be properly allocated to Medicaid. *Id*. The FI used this data to determine the number of Medicaid-eligible patient days that should have been included in each hospital's Medicaid Fraction for fiscal year 1996. *Id*.

Unbeknownst to the FI, the total number of the Medicaid-eligible patient days listed for each hospital in the Kansas Report also included MediKan-eligible patient days. *Id*. In other words, the Kansas Report included days associated with patients who were *not* eligible for Medicaid, but were eligible for MediKan. AR 3-4, 959. The FI issued the Notice of Program

---

[5]    All three Plaintiffs in this action challenge the Final Agency Decision that declined to include certain MediKan days in the numerator of their Medicaid Fractions. However, Plaintiff University of Kansas Hospital Authority ("KU") has to surmount a jurisdictional issue raised by the Secretary before reaching the merits of that decision. The Secretary contends that if this Court were to sustain the Final Agency Decision on the merits with respect to Plaintiffs Via Christi and Stormont-Vail, then judicial review of the Secretary's further decision regarding KU would be unnecessary. Def.'s Mot. at 32 n. 8. Plaintiffs do not contest this. Because this Court will affirm the Final Decision, it will refrain from addressing the portion of the decision that addresses KU.

Reimbursement ("NPR") for each hospital based on the information contained in the Kansas Report. Because the FI used the total number of Medicaid-eligible patient days listed in the Kansas Report to calculate the Plaintiffs' Medicaid Fractions, the FI inadvertently and mistakenly included MediKan-eligible patient days in the Fractions. *Id*.

However, the FI did not include *all* of Plaintiffs' MediKan-eligible patient days in their Medicaid Fractions. Pls.' Mot. at 15. Recall that MediKan-eligible patient days are divided into two categories: primary and secondary. The State of Kansas only included primary MediKan-eligible patient days in its list of Medicaid-eligible patient days for each Plaintiff. *Id*.; AR 2-3. This is because, in the case of secondary MediKan days, while a patient may have been MediKan-eligible, MediKan did not pay Plaintiffs for the patient's services. AR 2-3. Rather, a different insurer (the patient's primary insurer) paid Plaintiffs for the services. *Id*.

Plaintiffs concede that under the Medicare statute and HCFA Ruling 97-2, MediKan-eligible patient days, whether primary or secondary, cannot be counted in their Medicaid Fractions (but for the hold harmless provision in the Program Memorandum) because MediKan beneficiaries are not eligible for Medicaid. Pls.' Mot. at 22. Nevertheless, they appealed the FI's award in the NPR, arguing that because the FI erroneously included primary MediKan days in their Medicaid Fractions, it should have also included the secondary MediKan days pursuant to the hold harmless provisions of the Program Memorandum. AR 223-4, 231-32.

The appeal wound its way through the administrative system, until the Secretary issued a Final Agency Decision on May 27, 2011. AR 2-24. In its decision, the Secretary determined that the FI properly excluded the secondary MediKan days from Plaintiffs' Medicaid Fractions because the secondary MediKan days were not subject to the 1999 Program Memorandum's hold harmless provisions. AR 20. The Secretary found that the secondary MediKan days would

qualify for the hold harmless relief only if "these days had been erroneously included in the provider's [Medicaid Fraction] in the past," but there was no evidence that the two providers' past Medicaid Fractions had included secondary MediKan days. *Id*. It is this determination that Via Christie and Stormont-Vail challenge in the instant action.

### C.    Proceedings in District Court

On July 28, 2011, Plaintiffs filed a complaint challenging the May 27, 2011 final decision. Dkt. No. 1. At the parties' request, this Court stayed further proceedings pending a final decision in *Baptist Memorial Hospital v. Sebelius*, Case No. 11-cv-5113 (D.C. Cir. 2011). Following the Circuit's decision in *Baptist*, Plaintiffs filed an amended complaint on July 12, 2012, wherein they eliminated two of their original theories for relief. Dkt. No. 15. The operative complaint now contends that Plaintiffs are entitled to relief under the Past Payment prong of the 1999 Program Memorandum.

The Secretary filed an answer to Plaintiffs' amended complaint and the parties filed cross motion for summary judgment. The motions are now ripe for review.

## IV.    DISCUSSION

### A.    Standard of Review

Review of the Secretary's decisions is governed by 42 U.S.C. § 1395oo(f)(1), which incorporates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Accordingly, a court may set aside a final agency action only when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A),(E). Under both the "arbitrary and capricious" and "substantial evidence" standards, the scope of review is narrow and a court must not substitute its judgment for that of the agency. *Motor Veh. Mfrs. Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43 (1983); *Gen. Teamster*

*Local Union No. 174 v. Nat'l Labor Relations Bd.*, 723 F.2d 966, 971 (D.C. Cir. 1983). As long

as an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its

action including a rational connection between the facts found and the choice made," a reviewing

court will not disturb the agency's action. *MD Pharm., Inc. v. Drug Enforcement Admin.*, 133

F.3d 8, 16 (D.C. Cir. 1998) (quoting *Motor Veh. Mfrs. Ass'n*, 463 U.S. at 43)). The burden of

showing that an agency's action violates the APA falls on the challenger. *See Diplomat*

*Lakewood Inc. v. Harris*, 613 F.2d 1009, 1018 (D.C. Cir. 1979).

The Supreme Court in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837

(1984) enunciated that a reviewing court must first asks "whether Congress has directly spoken

to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for

the court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress." *Chevron*, 467 U.S. at 842–43; *see also id*. at 843 n. 9 ("[A]dministrative

constructions which are contrary to clear congressional intent" must be rejected by the court).

"When performing this first step, [courts] employ traditional tools of statutory construction."

*Independent Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000) (citing

*Chevron*, 467 U.S. at 842–43). In conducting this stage of the *Chevron* analysis, the court

"giv[es] no deference to the agency's interpretation." *American Fed'n of Labor & Congress of*

*Indus. Orgs. v. Federal Election Commission*, 333 F.3d 168, 173 (D.C. Cir. 2003).

If the court finds that "the statute is silent or ambiguous with respect to the specific issue,

the question for the court is whether the agency's answer is based on a permissible construction

of the statute." *Chevron*, 467 U.S. at 843. The court must defer to the Secretary's interpretation

"whenever it is a permissible construction of the statute." *HCA Health Servs. of Oklahoma v.*

*Shalala*, 27 F.3d 614, 617 (D.C. Cir. 1994) (citing *Chevron*, 467 U.S. at 842-44)). Similarly, the

Secretary's interpretation of her own regulations is entitled to substantial deference. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). The court must give the Secretary's interpretation "controlling weight" unless it is "plainly erroneous or inconsistent with the regulation." *Id*. (citations omitted). "[B]road deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Id*. (quoting *Pauley v. BethEnergy Mines, Inc*., 501 U.S. 680, 697 (1991)).

**B.    Analysis**

In the May 27, 2011 Final Agency Decision, the Secretary concluded that the FI properly excluded the contested secondary MediKan days from Plaintiffs' 1996 Medicaid Fractions. The Secretary reached this conclusion via two determinations. First, she determined that because MediKan beneficiaries are not eligible for Medicaid, all MediKan days—regardless of whether they are primary or secondary days—should be excluded from Plaintiffs' Medicaid Fractions. AR 18-19. Second, the Secretary determined that Plaintiffs' secondary days were not entitled to reimbursement pursuant to the Past Payment Prong of the Program Memorandum's hold harmless provision. AR 19-20. Under the Past Payment Prong, FIs were to continue to allow erroneously included days in a provider's Medicaid Fraction, but "*only if* these days had been erroneous[ly] included in the provider's [Medicaid Fraction] in the past." AR 20 (emphasis in original). According to the Secretary, Plaintiffs failed to demonstrate that secondary MediKan days were included in their Medicaid Fractions in the past; therefore, the FI properly excluded the days from their 1996 Medicaid Fractions. *Id*.

Plaintiffs challenge this decision. Their argument is two-fold. First, Plaintiffs concede that but for the hold harmless provision in the Program Memorandum, no MediKan days can be properly included their Medicaid Fractions. Pls.' Mot. at 22; Dkt. No. 24, Plaintiffs' Memorandum in Opposition to Defendant's Cross Motion for Summary Judgment "Pls.' Opp." at 1. Nevertheless, they contend that when the Secretary agreed to hold harmless hospitals for which MediKan days were erroneously included in their Medicaid Fractions, she was essentially "decreeing" that MediKan days were Medicaid-eligible (at least for fiscal years ending by 1999). Second, once the Secretary decreed that MediKan days were Medicaid-eligible, it was arbitrary and capricious of her to distinguish between primary and secondary MediKan days. According to Plaintiffs, it is irrelevant that only primary MediKan days were included in their past Medicaid Fractions because "the plain language of the [Program Memorandum]" groups "paid and unpaid MediKan...days in a single category of days that is afforded protection under the [Program Memorandum]." Pls.' Opp. at 1. Plaintiffs contend that the Secretary's "distinction between 'primary' and 'secondary' MediKan Days [is] little more than an *ex post facto* rationalization for denial that [is] not anchored in the language of the [Program Memorandum] itself." *Id*. at 2.

The Secretary urges this Court to affirm the Final Agency Decision. She argues that her determination that Plaintiffs are not entitled to relief under the Past Payment Prong of the Program Memorandum fully comports with the language of the Memorandum and is supported by substantial record evidence. Therefore, the Secretary argues, the Final Decision must be sustained.

    **1.**    **But for the Hold Harmless Provision in the Program Memorandum, MediKan Days Cannot Be Included in a Provider's Medicaid Fraction**

This Court concludes under *Chevron* step one that the Secretary properly determined that all MediKan days—whether primary or secondary—should be excluded from a provider's

Medicaid Fraction (with the limited exception that a provider may be entitled to relief under the

hold harmless provision of the Program Memorandum).  As explained at the outset, in order to

include MediKan days in their Medicaid Fractions, Plaintiffs must demonstrate that MediKan

beneficiaries are "eligible for medical assistance under a State plan approved by [Medicaid]"

within the meaning of the Medicare DSH adjustment. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). As

this Circuit has already held in *Adena Regional Medical Center v. Leavitt*, 527 F.3d 176 (D.C.

Cir. 2008), the term "medical assistance," which is not defined in the Medicare DSH adjustment,

has the same meaning as it has in the Medicaid statute. *Adena*, 527 F.3d at 179. The Medicaid

statute defines "medical assistance" as "payment of part or all of the cost" of medical "care and

services" for a defined set of individuals. *Id*. at 179 (quoting 42 U.S.C. § 1396d(a)). To wit, the

*Adena* Court concluded that the phrase "eligible for medical assistance under a State plan

approved by [Medicaid]" in the Medicare DSH adjustment means "eligible for Medicaid funds."

*Id*. at 180; *see also*, *Banner Health*, 715 F. Supp. 2d at 162. Therefore, in order to include days

associated with a patient's treatment in a provider's Medicaid Fraction, that patient must be

eligible for Medicaid. Because MediKan beneficiaries, *by definition*, are not eligible for

Medicaid, days associated with their treatment cannot be included in a provider's Medicaid

Fraction. *See Adena*, 527 F.3d at 180 (holding under *Chevron* step one that State-only plan

beneficiaries are not Medicaid-eligible and, thus, the Secretary properly excluded days

associated with those patients from the Medicaid Fraction); *Accord Univ. of Wash. Med. Ctr. v.

Sebelius*, 634 F.3d 1029, 1034-36 (9th Cir. 2010) (holding under *Chevron* step one that "eligible

for medical assistance" is unambiguously limited to individuals who are eligible for traditional

Medicaid, and therefore, Washington's State-only days cannot be counted in the Medicaid

Fraction); *Banner Health*, 715 F. Supp. 2d at 162 (holding that the "Medicaid [F]raction requires

that a patient be eligible for medical assistance (*i.e*., eligible for federal Medicaid funds)" under an approved state Medicaid plan and that patient days under Arizona's State-only program were properly excluded from the Medicaid Fraction); *see also*, *Phoenix Mem'l Hosp. v. Sebelius*, 622 F.3d 1219, 1225-27 (9th Cir. 2010); *Cooper Univ. Hosp. v. Sebelius*, 686 F. Supp. 2d 483, 498 (D.N.J. 2009), *aff'd*, 636 F.3d 44 (3d Cir. 2010). In accordance with the D.C. Circuit's holding in *Adena*, this Court concludes under *Chevron* step one that MediKan beneficiaries are "not eligible for medical assistance" within the meaning of the Medicare DSH adjustment, and as such, MediKan days must be excluded from a provider's Medicaid Fraction.

### 2. The Hold Harmless Provision Does Not Render MediKan Days Medicaid-Eligible within the Meaning of the Medicare DSH Adjustment

Plaintiffs argue that by agreeing to hold harmless those hospitals that were paid Medicare DSH adjustments based on Medicaid Fractions that erroneously included MediKan days, the Secretary "decreed" that MediKan beneficiaries are Medicaid-eligible (at least for fiscal years that ended before 1999). Pls.' Mot. at 32. According to Plaintiffs, because the constitution requires the Secretary to ensure that Medicare funds are used only for Medicare approved expenditures (here, to reimburse hospitals for the treatment of Medicaid-eligible patients), by allowing FIs to reimburse hospitals for MediKan days, she necessarily must have determined that MediKan beneficiaries are Medicaid-eligible. *Id*. This argument warrants little discussion. The Secretary has never considered MediKan beneficiaries to be Medicaid-eligible and has consistently held that MediKan beneficiary days cannot be included in the Medicaid Fraction. *See* HCFA Ruling 97-2 (the Medicaid Fraction does "not include days for which no Medicaid payment was made...because an individual was not eligible for Medicaid"); HCFA Ruling 97-2 Instructions ("[I]n calculating the number of Medicaid[-eligible] days, [FIs] should ask

16

themselves, "Was this person a Medicaid [] beneficiary on that day of service?" If the answer is "yes," the day counts in the Medicaid [Fraction]"); Program Memorandum ("[T]he focus is on the patient's eligibility for *medical assistance under an approved [Medicaid] State plan*...not medical assistance under a State-only program...some States provide medical assistance to beneficiaries of [State-only plans]. These beneficiaries, however, are not eligible for Medicaid under a State plan...and, therefore, days utilized by these beneficiaries do not count in the Medicare disproportionate share adjustment calculation") (emphasis in original).

The fact that the Secretary implemented a hold harmless provision in the Program Memorandum is not a concession that MediKan beneficiaries are Medicaid-eligible, as Plaintiffs would have this Court believe. Rather, it is the Secretary's measured attempt to remedy a breakdown in the system. The hold harmless provision is well within the Secretary's discretionary authority to avoid the transaction costs attributable to reopening and recouping erroneous payments, defending ensuing appeals, and to avoid the unfair repercussion for those providers who calculated their budgets based on these erroneous payments. *See, e.g, Paloma Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1165 (9th Cir. 2012) ("Congress gave the Secretary discretion to set guidelines governing the reopening and revision of claim determinations and to structure the means of enforcing such guidelines so as to achieve efficiency and accuracy in the administration of the Medicare program."); *Rush University Med. Ctr. v. Leavitt*, 535 F.3d 735, 738-39 (7th Cir. 2008) (noting, without questioning the Secretary's authority to do so, that the Program Memorandum's hold harmless provision was intended to "grandfather" in payments that "classified general-assistance patients with Medicaid patients" based on cost reports filed prior to October 15, 1999). This is particularly true under the specific circumstances of the Program Memorandum, which noted that the erroneous payments were made to due the actions

of third parties. *See United Hosp. v. Thompson*, 2003 WL 21356086, *5 (D. Minn. June 9, 2003)

("The record indicates that [the Secretary's] policy has consistently been that general assistance

days are not relevant to the Medicaid fraction, and the Program Memo[random] simply reiterates

that position. The fact that hospitals ... misunderstood the policy and acted in reliance upon that

misunderstanding and the fact that [the Secretary] decided to provide those hospitals with relief

from their own mistake do not lead to the conclusion that [the Secretary] had some obligation to

extend additional benefits to other hospitals.").

**3.      The Secretary Properly Distinguished between Primary and Secondary
        MediKan Days**

Next, Plaintiffs argue because the FIs included primary MediKan days in their past

Medicaid Fractions, under the Past Payment Prong of the hold harmless provision, the FIs were

required to include secondary MediKan days in their 1996 Medicaid Fractions. They contend

that it was arbitrary and capricious for the Secretary to distinguish between primary and

secondary MediKan days. The Court finds this argument to be without merit.

As previously discussed, because secondary MediKan days were not paid by the State of

Kansas (*i.e.*, the services were paid by another primary payor), those days were not included in

the Kansas Report. And, because the secondary MediKan days were not included in the Kansas

Report, the FI did not include those days in Plaintiffs' Medicaid Fractions. Based on the fact that

Plaintiffs failed to demonstrate that they had been paid for secondary MediKan days in the past,

the Secretary concluded that the secondary MediKan days did not qualify for the hold harmless

relief under the Past Payment Prong of the Program Memorandum.

The Secretary's determination is grounded in the plain language of the Program

Memorandum. The Memorandum clearly limits application of the Past Payment Prong to the

practice of how a hospital was paid in the years before 1999: "you are to continue to allow these

types of days in the [Medicaid Fraction] for all open cost reports *only in accordance with the practice followed for the hospital at issue before October 15, 1999* (*i.e.*, for open cost reports, *you are to allow only those types of otherwise ineligible days that the hospital received payment for in previous cost reporting period* settled before October 15, 1999)." Dkt. No. 21, Ex. 1 at 3 (emphasis added). Plaintiffs fail to point to any evidence in the record that suggests that secondary MediKan days were ever included in their Medicaid Fractions. Thus, the Secretary's conclusion—that the secondary MediKan days should not be included in Plaintiffs' 1996 Medicaid Fractions because they had not been paid for such days in the past—comports fully with the language of the Program Memorandum. *See, e.g., Banner Health*, 715 F. Supp. 2d at 163-164 (Secretary's determination that the hold harmless provision did not apply "was supported by substantial evidence and represented a rational connection between the facts found and the choice made" because the "record demonstrate[d] that the 'practice followed' by [the providers] during the cost years they [were] appealing was not to include the [State-only days] in their cost reports") (internal citations and quotations omitted); *Phoenix Mem'l Hosp.*, 2009 WL 8517230 at *11 (Secretary properly decided that hospitals could not include State-only days in their DSH calculations under the "prior practice" provision of the Program Memorandum because they "had no expectation of being paid for such days since they had not been paid for such days since 1990").

Furthermore, the Court finds it significant that one of the reasons the Secretary offered the hold harmless provision is because she recognized that some FIs had mistakenly included State-only days (*e.g.* MediKan days) in some providers' Medicaid Fractions, thus allowing the providers to receive Medicare reimbursement for those days. Def.'s Mot. at 28. The Secretary recognized that these providers may have come to rely on such payments in their budgeting

process. The hold harmless provision "was intended to protect providers who were operating under the erroneous belief that they were entitled to include [State-only] days for purposes of Medicare reimbursement, and who had budgeted in reliance on [FIs] who allowed them to include those days in their cost reports." *Rush Univ. Med. Ctr. v. Leavitt*, 2007 WL 2669021, at * 8 (N.D. Ill. Sept. 4, 2007), *aff'd*, 535 F.3d 735 (7th Cir. 2008). Here, Plaintiffs have never received Medicare reimbursement based on secondary MediKan days since those days were never included in Kansas' annual Medicaid reports. Thus, Plaintiffs could not have budgeted in reliance on the inclusion of those days.

Nor is this Court persuaded by Plaintiffs' argument that the Program Memorandum does not distinguish between primary and secondary MediKan days. This argument misses the point. The Program Memorandum clearly and repeatedly emphasizes that *all* State-only days (*e.g.* MediKan days) "do not count in the Medicare [DSH adjustment] calculation" and payment based on such days was an error. The relevant question is to what extent did a hospital rely on an erroneous payment. Here, because neither Plaintiff has ever been paid based on the erroneous inclusion of secondary MediKan days in their Medicaid Fractions, they cannot reasonably argue that they relied on such payments. In fact, if the Secretary were to order inclusion of the secondary MediKan days in 1996 Medicaid Fractions, it would result in a windfall to Plaintiffs.[6]

Plaintiffs mistakenly proffer in support of their position the four Circuit decisions that determined that both paid and unpaid Medicaid-eligible days must be included in the Medicaid Fraction. Plaintiffs conflate the issue addressed in those cases—whether unpaid *Medicaid-*

---

[6]    Plaintiffs place significant stake on the fact that the attachment to the Program Memorandum groups both paid and unpaid State-only days into one category: "General Assistance Patient Days." Based on this, the Plaintiffs argue that the Program Memorandum did not intend to distinguish between primary and secondary General Assistance days, and by extension, primary and secondary MediKan days. The Court disagrees. The attachment provides a list of "Type[s] of Day[s]" and indicates whether each day is an "Eligible Title XIX Day." In other words, the attachment describes how the FIs are *supposed* to interpret HCFA Ruling 97-2. It once again clarifies that State-only days, regardless of payment, are not Medicaid-eligible days and, as such, cannot be included in the Medicaid Fraction.

*eligible days* must be included in the Medicaid Fraction—with the issue presented here—whether unpaid *State-only days* should be included in the Medicaid Fraction via the Program Memorandum's hold harmless provision. The Secretary concedes that if MediKan days were Medicaid-eligible days, they must be included in the Medicaid Fraction regardless of whether they are primary or secondary days (*i.e.* paid or unpaid days). But that is not the issue here. MediKan days are not Medicaid-eligible days. As such, the only way Plaintiffs are entitled to include such days in their Medicaid Fractions is if the FI mistakenly did so in the past. The FI included primary MediKan days in Plaintiffs' past Medicaid Fractions, so under the hold harmless provision, primary MediKan days should have been included in the 1996 Medicaid Fractions. They were. But, by the same token, the FI did not include secondary MediKan days in the Plaintiffs' past Medicaid Fractions. As such, the FI properly denied their inclusion in the 1996 Medicaid Fractions. Accordingly, the Secretary's determination that the hold harmless provision did not apply to Plaintiffs with respect to the secondary MediKan days is supported by substantial evidence and represented a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S.,* 463 U.S. at 43.

## V.    CONCLUSION

For the foregoing reasons, the Court HEREBY DENIES Plaintiffs' Motion for Summary Judgment (Dkt. No. 21) and GRANTS Defendant's Cross Motion for Summary Judgment (Dkt. No. 23).

Dated this 15th day of July, 2013.

Barbara Jacobs Rothstein
U.S. District Court Judge